IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ARMOUR OF AMERICA,       )
                                   )
           Plaintiff,       )
                                   )            No. 04-1731C
        v.            )      (Judge Marian Blank Horn)
                                   )
THE UNITED STATES,        )
                                   )
         Defendant.    )

DEFENDANT'S POST-TRIAL BRIEF REGARDING THE
GOVERNMENT'S COUNTERCLAIM SEEKING RE-PROCUREMENT COSTS

Pursuant to the Court's September 26, 2008 Order, defendant, the United States, respectfully submits the Government's post-trial brief regarding the Government's counterclaim seeking re-procurement costs. The Government does not request oral argument regarding this issue.

BACKGROUND

The Request For Proposals (RFP)

On December 23, 2003, the Navy issued a request for proposal (RFP) for a Light Weight Armor Replacement System (LWARS) to replace the existing CH-46E metallic armor system with a lightweight substitute. Joint Exhibit (JE) 7 at 0440. The CH-46E, a Marine helicopter, is fitted with metallic armor plates to protect the engines and the hydraulic flight control closet from small arms fire. Id. The CH-46E provides personnel and equipment support and medical evacuation services in Iraq and Afghanistan. Testimony of Jon Winchester (Winchester) at 448; testimony of Janice Woehrer (Woehrer) at 99; testimony of Col. Mitch Bauman (Bauman) at 398. The efficiency of the CH-46E to perform its medium lift assault support mission largely depends on aircraft payload. JE 7 at 0440. Over 39 years of service, the empty weight of the CH-46E had grown by 1600 pounds, limiting payload and range and

degrading mission performance.  Id.  Reducing the empty weight of the CH46-E helicopter by means of weight reduction initiatives was considered to be a low risk, viable means of restoring mission effectiveness.  Id.  In addition, the CH-46E operates with little to no margin of safety in relation to torque available versus torque required.  Id.  Providing lighter armor not only positively impacts mission restoration, but also provides some margin of safety to torque available.  Id.

The RFP was premised upon Congress providing $5M in Global War On Terrorism (GWOT) funds to the Navy to increase the payload recovery of the CH-46E.  Winchester at 448; testimony of Carol Tisone (Tisone) at 343.  Carol Tisone, the Source Selection Authority (SSA), described GWOT money as supplemental funding that is not budgeted by the program office, but directly provided by Congress.  Tisone at 343.  Jon Winchester noted that GWOT funds were provided by Congress for "immediate help to the war on terror, so [Congress] expected it to be spent in short order."  Winchester at 448.

Section C of the RFP contained the description of the product sought to be procured, that is the LWARS, the specifications, and the statement of work (SOW).  JE 7 at 0433.  Section C, part 2, titled "Scope," provided that the contractor shall "design, test, and manufacture" a LWARS for the CH-46E helicopter.  JE 7 at 0440; JE 135 at 47.  Section C, part 4, titled "LWARS Nonrecurring Engineering Requirements [NRE]," contained the specific weight and ballistics requirements.  Id.  The NRE section provided in pertinent part as follows:

> 4.1.    LWARS Requirements (CLIN 0001):  The contractor shall design a LWARS to be a fit and function lightweight replacement for the existing metallic armor system. . . .   The LWARS shall shall provide, at a minimum, a 35 % reduction in areal density over the existing metallic armor system, . . .   The LWARS shall be capable of at least a $V_{50}$ ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at 30-degree angle of obliquity.

> The LWARS shall be able to withstand multiple ballistic impacts,
>
> . . . .

JE 7 at 0440.

In summary, the SOW in the RFP required that the contract awardee design, test, and fabricate a LWARS that would provide at least a 35 percent reduction in weight compared to the metallic armor, and be capable of withstanding a threat with a $V_{50}$ ballistic limit of 2900 feet per second (fps) against a .30 caliber armor piercing missile (APM) at a 30-degree angle of obliquity.  JE 7 at 0440 and 0442; JE 135 at 35 and 49.  The RFP did not specify the type of armor sought to be procured.  <u>See</u> JE 7.  That is, an offeror was free to propose a metallic armor, or a ceramic armor, or any other armor, as long as it met the requirements set forth in the RFP.  <u>See</u> JE 7.

<u>AOA's Proposal And Its Evaluation</u>

The Source Selection Evaluation Board (SSEB) consisted of the following components: (1) The Source Selection Authority (SSA), Carol Tisone, JE 8 at 0544, who was responsible for approving the Source Selection Plan (SSP); ensuring that the source selection process was properly conducted; reviewing the recommendations for award; determining which proposal was the best value for the Government; and awarding the contract.  JE 8 at 0535.  (2) The Competitive Award Panel (CAP), which included Janice Woehrer, the contracting officer (CO), JE 8 at 0544, and Lt. Col. Mitch Bauman, the program manager, was responsible for preparing the RFP, the SSP, and the evaluation criteria; providing guidance to the evaluation teams; evaluating the reports from the evaluation teams; ensuring that the evaluations were impartial, comprehensive, and consistent with the RFP and the SSP; assigning an overall rating by compiling the evaluation responses; and recommending award based upon the initial offers.

3

JE 8 at 0535-0536.  (3) The Evaluation Teams, consisting of a Technical Evaluation Team (TET) and a Past Performance Evaluation Team (PPET),[1] that were were responsible for assisting in the preparation of the RFP, the SSP, and the evaluation criteria; evaluating the proposals in accordance with the RFP and the SSP; submitting evaluation reports detailing their findings and recommendations to the CAP; and participating in debriefings as required by the CAP chairperson, JE 8 at 0536, and the and a Price Evaluation Team (PET), that was responsible for assisting in the preparation of the RFP, the SSP, and the evaluation criteria; reviewing and evaluating the certifications, and any exceptions, deviations, and waivers submitted with each proposal; analyzing the realism of the cost or price if required by the RFP; and preparing an evaluation report for the CAP.  JE 8 at 0536-0537.

Armour of America (AOA) submitted its initial proposal on February 5, 2004.  See JE 25, General Information, Volume I; JE 26, Technical, Volume II; JE 28, Past Performance, Volume III; and JE 29, Price, Volume IV.  AOA identified its off-the-shelf KSP-60 armor as its proposed material to meet the RFP requirements.  JE 26 at 0622; JE 135 at 30-31.  AOA claimed that KSP-60 offered a weight savings of 43 percent.  Id.  See also JE 35 at 0706 (weight saving of 42 per cent); JE 47 at 0774 (weight saving 41 percent plus/minus five pounds); and JE 127 at 42 (weight savings of 41 per cent).  AOA's initial offer was in the approximate amount of $8.3M, based upon the assumption that all options would be executed.  JE 29 at 0647 -0651; JE 136 at 91.  In its April 12, 2004 revised price proposal, AOA again offered a total contract price of approximately $8.3M.  JE 30, Price, Volume IVA, at 0656.

By letter dated May 6, 2004, AOA lowered the amount of its proposal, and informed the

---

[1]    Jon Winchester was a member of the PPET.  JE 8 at 0536 and 0544.

CO that it was making no additional changes to its proposal.  JE 32 at 0658.  See also JE 136 at

91.  AOA's May 6, 2004 offer was in the amount of approximately $6M.  JE 32 at 0662.

The Award To AOA

Carol Tisone, the SSA, selected AOA's proposal, from among the nine proposals

considered, based upon her determination that it represented the best value to the Navy.  JE 1-7

at 0076; JE 1-9 at 0094.  The contract with AOA was executed on June 10, 2004.  JE 47 at 0765;

JE 136 at 107; Tisone at 352.

The contract had a potential contract value of $6,038,958.00.  JE 47 at 0767 - 0773 (total

amount of the CLINs).  This amount included the base contract, as well as all options for the

production units.  Id.  CLINs 0001-0004 comprise the base contract.  JE 47 at 0767 - 0768.  The

amount for CLIN 0001, covering the 5-month LWARS Non Recurring Engineering (NRE)

period from June 10, 2004, the date of the award, to November 10, 2004, was $0.  Id.  See also

JE 136 at 93.  The amount for CLIN 0002, covering the delivery of the two Qualification Test

Articles (QTAs) by the November 10, 2005 deadline, was $69,814.  JE 47 at 0767.  The amount

of CLIN 0003, covering the provision of the data for CLINs 0001 and 0002, was $0.  Id.  CLIN

0004, covering travel costs in support of CLINs 0001 and 0002, was a cost reimbursable line

item not to exceed (NTE) $50,000.  JE 47 at 0767 - 0768.  The amount for CLIN 0005AA, part

of the first production option, requiring the provision of 147 kits, or shipsets,[2] was $3,164,616, or

$21,528 per shipset, and the amount for CLIN 0005AB, the second part of the first production

option, requiring the provision of 79 shipsets, was $1,700,712, or $21,528 per shipset.  JE 47 at

0769.  The amount for CLIN 0006AA, part of the second production option, requiring the

---

[2]  "Kit" and "shipset" are used interchangeably.

provision of 147 shipsets, was for $503,916, or $3,428 per shipset, and the amount for CLIN

0006AB, the second part the of the second production option, requiring the provision of 79

shipsets was $129,168, or $3,428 per shipset.  JE 47 at 0770.  The amount for CLIN 0007AA,

the option for Group A spares, requiring the provision of six shipsets was $129,168, or $21,528

per shipset. JE 47 at 0770.  The amount for CLIN 0007BB, the option for Group B spares,

requiring the provision of six shipsets, was $20,568, or $3,428 per shipset.  JE 47 at 0771.  The

amount for CLIN 0008AA, the option for Group A trainer kits, and the amount for CLIN

0008AB, the option for Group B trainer kits, were $43,056 and $6,856, respectively.  JE 47 at

0771-0772.  The amount for CLIN 0009, the option for field support services was $29,440.  JE

47 at 0772.  The amount for CLIN 0010, the option for travel in support of field support services,

was a NTE amount of $50,000.  Id.

No options had been exercised on AOA's contract prior to the default termination.

Therefore, at the time of termination, the value of AOA's base contract was about $120,000, the

total amount of CLINs 0001-0004.  JE 47 at 0767 - 0768.

The contract weight specification read as follows:

> [t]he LWARS shall provide, at a minimum, a 41% +/- 5 lbs.
> reduction in areal density over the existing metallic armor system,
> . . .

JE 47 at 0774.

This constituted an enhancement offered by AOA over the RFP requirement of a

minimum 35 percent weight reduction.  See JE 7, the RFP; JE 27, AOA's Proposal, Technical,

Volume IVA; JE 46, AOA's request to change the 41 percent to 41 per cent +/- 5 pounds and

the Navy's concurrence.  JE 47 at 0774.

The pertinent contract ballistic specification read as follows:

6

> [t]he LWARS shall be capable of at least a $V_{50}$ ballistic limit of
> 2900 feet per second against a .30 caliber APM2 threat at
> 30-degree angle of obliquity" and the "LWARS shall be able to
> withstand multiple ballistic impacts of 3 equidistant hits in a
> 3-inch circle, which is 2.6 inches between shots, . . .

JE 47 at 0774.

The requirement that the LWARS be capable of at least a $V_{50}$ ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at 30-degree angle of obliquity was identical to the requirement contained in the RFP.  See JE 7 and JE 47; Testimony of John Nehmens (Nehmens) at 1019.

With respect to multi-hit capability, the RFP required that the LWARS be able to withstand multiple ballistic impacts.  JE 7 at 0440.  The contract contained the enhancement offered by AOA in its proposal, that is, that the LWARS would be able to withstand multiple ballistic impacts of three equidistant hits in a three-inch circle.  JE 47 at 0774.

The contract included a five-month NRE period during which AOA was to design and test its armor and fabricate the QTAs.  JE 47 at 0785; Nehmens at 1020.  CLIN 0002 required that AOA deliver no later than five months after contract award the two QTAs.  JE 47 at 0785. Since the contract was awarded on June 10, 2004, AOA was required to complete the NRE design phase and deliver the QTAs no later than November 10, 2004.  JE 47 at 0765 and 0785.

AOA's Termination For Default

On August 26, 2004, after concluding that AOA was unable to meet the contractual weight and ballistic requirements, and that AOA's participation in the LWARS program was not essential to successful performance under this program, the CO terminated AOA's contract for default for failure to make progress which had endangered performance under the contract.  JE 1-20 at 0173 - 0175; JE 1-21 at 0177 -0178.

On February 28, 2005, the CO sent AOA a letter demanding payment of $2,099,438 in re-procurement costs.  JE 110 at 1044.  This letter was sent prior to the completion of the re-procurement contract.  Woehrer at 200-201.  The value of the re-procurement contract was decreased as the result of contract modifications.  See JE 122; JE 110 and JE 131.

Award of Re-Procurement Contract to ArmorWorks

Following AOA's default termination, the SSEB reconvened to reconsider the proposals that had been submitted by the other offerors to the RFP which were in the competitive range.  Woehrer at 197; Tisone at 366[3].  After considering the TET's, the PPET's and the PET's findings, the SSA determined that the proposal submitted by ArmorWorks (AW) represented the best value to the Government.  Woehrer at 197; Tisone at 366.

On November 5, 2004, the Navy awarded the re-procurement contract to AW.  JE 122.  AW's contract had a potential contract value of $8,978,672.  JE 122 at 1187-1193 (total amount of the CLINs).  The amount for CLIN 0001, covering the NRE period from November 5, 2004, the date of the award, to April 5, 2005, was $282,500.  JE 122 at 1187.  The amount for CLIN 0002, covering the provision of the two QTAs by April 5, 2005, was $85,000.  Id.  The amount of CLIN 0003, covering the provision of the data for CLINs 0001 and 0002, was $0.  Id.  The amount for CLIN 0004, covering travel costs in support of CLINs 0001 and 0002, was a cost reimbursable line item NTE $50,000.  JE 122 at 1188.  The amount of CLIN 0005AA, the first part of the first production option, requiring the provision of 147 shipsets of armor, was for

_____

[3]  Ms. Tisone testified that all offerors who submitted proposals in response to the RFP that led to the award of the contract to AOA were asked whether they would like to be considered for award of the re-procurement contract.  **Tisone at 366.**  The Navy did not change any of the requirements in the RFP.  Id.

$4,508,490, or $30,670 per shipset.  JE 122 at 1189.  The amount for CLIN 0005AB, the second

part of the first production option requiring the provision of 79 shipsets, was for $2,422,930, or

$30,670 per shipset.  Id.  The amount for CLIN 0006AA, the first part of the second production

option, requiring the provision of 147 shipsets, was $808,500, or $5,500 per shipset.  JE 122 at

1190.  The amount for CLIN 0006AB, the second part of the second production option, requiring

the provision of 79 shipsets, was $434,500, or $5,500 per shipset.  Id.  The amount for CLIN

0007AA, the option for Group A spares, requiring the provision of six shipsets, was $200,850, or

$33,475 per shipset.  JE 122 at 1191.  The amount for CLIN 0007AB, the option for Group B

spares, requiring the provision of six shipsets, was $38,994, or $6,499 per shipset.  Id.  The

amount for CLIN 0008AA, the option covering Group A trainer kits, requiring the provision of

two shipsets, was $66,950, or $33,475 per shipset.  JE 122 at 1192.  The amount for CLIN

0008AB, the option for Group B trainer kits, requiring the provision of two shipsets, was

$12,998, or $6,499 for each shipset.  Id.  The amount for CLIN 0009, the option covering field

support services, was $16,960.  JE 122 at 1193.  The amount for CLIN 0010, the option covering

travel in support of CLIN 0009 was NTE $50,000.  Id.

Section 4 of the contract, LWARS Nonrecurring Engineering Requirements, provided as

follows:

4.1.    LWARS Requirements (CLIN 0001):

The contractor shall design a LWARS to be a fit and
function lightweight replacement for the existing metallic armor
system. . . .  The LWARS shall weigh no more than 268 lbs per
shipset . . . .  The LWARS shall be capable of at least a $V_{50}$
ballistic limit of 2900 feet per second against a .30 caliber APM2
threat at 30-degree angle of obliquity.   The LWARS shall be able
to withstand multiple ballistic impacts spaced 6 inches apart or
greater, . . . .  Composite tile joints and edges of all armor products
shall meet the ballistic requirement.

9

JE 122 at 1194-1195.

The requirement in the AW contract that the LWARS weigh no more than 268 pounds per shipset is equivalent to a 46 per cent weight reduction, JE 122 at 1194, compared to the 41 per cent +/- 5 pound weight reduction requirement in AOA's contract.  See JE 47 at 0774.  The 46 per cent weight reduction constituted an enhancement offered by AW over the RFP requirement of a minimum 35 percent weight reduction.  See JE 7, the RFP, and JE 122.

The requirement that the LWARS be capable of at least a $V_{50}$ ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at a 30-degree angle of obliquity was identical to the requirement contained in the RFP, see JE 7 at 0440, and JE 122 at 1194-1195, and identical to the ballistic requirement in AOA's contract.  See JE 47 at 0774.

With respect to multi-hit capability, as previously mentioned, the RFP required that the LWARS be able to withstand multiple ballistic impacts.  JE 7 at 0440.  The contract contained the enhancement offered by AW that provided that the LWARS would be able to withstand multiple ballistic impacts spaced six inches apart or greater.  JE 121 at 1195.

The following modifications, pertinent to the re-procurement issue, were made to AW's contract.[4]

---

[4]  A summary of the other modifications follows:

Modification P00001, dated March 15,2005, incorporating various administrative changes, resulted in no additional cost to the contract and no change to the delivery schedule.  JE 122, Mod. 1 at 1240.

Modification P00005, dated September 19,2005, incorporating administrative changes and conditionally accepting15 production shipsets, resulted in no additional cost to the contract and no change to the delivery schedule.  JE 122, Mod. 5 at 1270.

Modification P00006, dated October 5, 2005, adding CLIN 11 to procure spare armor panels and associated components; exercising the option to procure two additional LWARS

Modification P00002, dated June 29, 2005, extended the NRE period, from April 5, 2005 to August 8, 2005, an extension of about four months, at the request of AW. JE 122, Mod. 2 at 1245. The additional time was needed by AW to design, test, and fabricate the QTAs because AW changed its proposed armor material from boron carbide to silicon carbide.[5] Id. In consideration for the extension of the NRE period, AW agreed to provide, at no additional cost

shipsets; and extending the option exercise date to allow the Navy to unilaterally procure additional shipsets if required, resulted in an increase in the contract value by $78,337.84, from $5,935,000 to $6,013,337.84, with no change to the delivery schedule. JE 122, Mod. 6 at 1275. There is no evidence in the record the option in CLIN 11 was exercised.

Modification P00008, dated January 23, 2006, correcting several lines of accounting set forth in Modification P00004, resulted in no additional cost to the contract and no change to the delivery schedule. JE 122, Mod. 8 at 1292.

Modification P00009, dated February 3, 2006, adding the Navy requirement for bumper stops for the armor panels, resulted in an increase to the contract amount by $8,152.24, from $6,013,337.84 to $6,021,494.08. Id. In addition, the delivery schedule was extended from February 17, 2006, to 10 March 10, 2006 for the bumper stops only. Id.

Modification P00010, dated March 6, 2006, correcting a shipping address, resulted in no additional cost to the contract and no change to the delivery schedule. JE 122, Mod. 10 at 1305.

Modification P00011 adding the Navy requirement for engine hinges, resulted in an increase in the contract amount by $60,213.84, from $6,021,494.08 to $6,081,707.92. JE 122, Mod. 11 at 1307. Id. In addition, the delivery schedule was extended from March 10, 2006 to November 22, 2006 for the engine hinges only. However, there is no evidence that these options were exercised. Id.

[5]. Modification P00002 also incorporated the requirements to paint and coat the LWARS, apply coating to the tile edges and provide additional fasteners and associated hardware. JE 122, Mod. 2 at 1245. This modification also extended the period of performance for Field Support Services, CLIN 0009; and required AW to absorb all labor and material costs associated with the non-recurring engineering applicable to the Navy's changes set forth in the statement of work. Id. Additionally, the provisions at E-2, Inspection and Acceptance point, H-1 Exercise of Options (CLINs 0005-0006), H-2 Exercise of Options (CLINs 0007-0010), and FAR clauses 52.217-7 and 52.217-9 were modified as reflected in the modification. Id. The modification further provided that the price adjustment for the material change and associated performance specification changes would be addressed in a subsequent modification. Id.

to the Navy, an accelerated delivery schedule for all option items, with delivery of the final

production shipsets no later than December 31, 2005, rather than by the original final delivery

date of October 2006, constituting a ten-month acceleration of the contract schedule.  Id.  This

modification resulted in no additional cost to the Navy.  Id.

Modification P00003, dated August 11, 2005, covered several Navy-initiated design

changes that resulted in the addition of nine pounds per shipset.  JE 122, Mod. 3 at 1254.  In

consideration for the material change to boron carbide, resulting in a 26 pound weight increase,

AW agreed to provide the Navy's required design changes at no cost and to reduce the fixed

prices for the production shipsets, from $30,670 to $27,252.  JE 122, Mod. 3 at 1254-1261.  This

modification resulted in no additional cost to the contract and no change to the delivery

schedule.  JE 122, Mod. 3 at 1254-1261.

Modification P00004, dated November 5, 2004, exercised the option for the production

of 164 shipsets.  JE 122, Mod. 4 at 1264.  As a result of this modification, the total contract value

was increased by $417,500, from $5,517,500, to $5,935,000, and no change was made to the

delivery schedule.  Id.

Modification P00007, dated December 7, 2005, removed the requirement that the

LWARS tile and joint edges meet the ballistic requirement.  JE 122, Mod. 7 at 1284.  This

modification also extended the final contract delivery date from December 31, 2005, to February

17, 2006.  JE 122, Mod. 7 at 1284.  In consideration for these changes, AW provided two

additional production shipsets, valued at $63,940, and incorporated a Navy-identified design

change to the armor hinges, with an estimated cost of $7,000, at no cost.  Id.  This modification

resulted in no additional cost to the Navy.  Id.

AW successfully completed performance under its contract. Woehrer at 197; Testimony

12

of Jack Plessinger (Plessinger) at 767.

> The Government Established That It Is Legally And Factually Entitled To Recover Its
> Re-procurement Costs In The Amount Of $1,553,068

As set forth in the Joint Statement of Issues of Law, the legal issues to be resolved are as follows: (1) whether the contracting officer complied with Federal Acquisition Regulations (FAR) 49.402-6 and 49.402-7(b), when she exercised her authority to replace the work that was to have been performed under the defaulted contract, and charge the excess costs to AOA; (2) whether the Government established a _prima facie_ case that the reprocurement contract was for fundamentally the same product sought to be procured under AOA's contract; (3) whether AOA sustained its burden of proof that there are material differences between the product sought to be procured under AOA's contract and the product procured under the reprocurement contract; and (4) whether the Government sustained its burden of proof with respect to the damages it incurred as a result of AOA's default.  In addition, as set forth in the Joint Statement of Issues of Fact, the factual issues to be resolved are as follows: (1) whether due to AOA's failure to adequately perform under the contract, the Government incurred damages of approximately $1,500,000; and (2) whether the original product sought to be procured under AOA's contract and the product procured under the reprocurement contract were fundamentally the same.

A.   The Contracting Officer Complied With The FAR When She Exercised Her Authority To
     Replace The Work That Was To Have Been Performed Under AOA's Defaulted Contract

Federal Acquisition Regulation (FAR) 49.402-6 (a), Repurchase against contractor's account, provides as follows:

> When the supplies or services are still required after termination,
> the contracting officer shall repurchase the same or similar
> supplies or services against the contractor's account as soon as
> practicable.  The contracting officer shall repurchase at as

13

> reasonable a price as practicable, considering the quality and
> delivery requirements. . .

There is no evidence in the record that would support a finding that the CO failed to properly exercise her authority under FAR 49.402-6(a).  It is undisputed that the LWARS was still required after termination, that the re-procurement contract was for the same LWARS that was the item sought to be procured under AOA's contract, that the contract was awarded to AW as soon as practicable; and that the repurchase price was reasonable.[6]

FAR 49.402-6 (b) provides as follows:

> (b) If the repurchase is for a quantity not over the undelivered quantity terminated for default, the Default clause authorizes the contracting officer to use any terms and acquisition methods deemed appropriate for the repurchase.  However, the contracting officer shall obtain competition to the maximum extent practicable for the repurchase.  The contracting officer shall cite the Default clause as the authority . . . .

Under FAR 49.402-6 (b), the CO was authorized to "use any terms and acquisition methods deemed appropriate for the repurchase."  As previously stated, the CO determined that the use of a SSEB, the same method used to award the contract to AOA, was an appropriate method by which to award the re-procurement contract; moreover, by using an SSEB, the CO obtained competition to the maximum extent practicable by evaluating all offers that were in the competitive range during the source selection that led to the award to AOA.[7]

FAR 49.402-6 (c) provides as follows:

---

[6]   No testimony was elicited by AOA's counsel that challenged the CO's compliance with this provision of the FAR.  See Tisone at 380-391; Woehrer at 208-228; Plessinger at 768-778; Winchester at 496-512; and testimony of Paul Fitzgerald (Fitzgerald) at 715-733.

[7]   No testimony was elicited by AOA's counsel that challenged the CO's compliance with this provision of the FAR.  See Tisone at 380-391; Woehrer at 208-228; Plessinger at 768-778; Winchester at 496-512; and Fitzgerald at 715-733.

> If repurchase is made at a price over the price of the
> supplies or services terminated, the contracting officer shall, after
> completion and final payment of the repurchase contract, make
> written demand on the contractor for the total amount of the
> excess, giving consideration to any increases or decreases in other
> costs such as transportation, discounts, etc. . .

As previously stated, because the amounts in AW's contract were in excess of the

amounts in AOA's contract, the CO made written demand upon AOA for the amount she

estimated were the Navy's re-procurement costs.  See JE 110.

Ms. Tisone, the SSA and the CO's supervisor, testified that the re-procurement process

was conducted in accordance with the FAR.  Tisone at 361-362.  Ms. Tisone's testimony in this

regard was not challenged on cross-examination,.  See Tisone at 380-391.  In short, there is no

evidence in the record that would support a finding that the CO failed to properly exercise her

authority to replace the work that was to have been performed under AOA's defaulted contract

and charge the re-procurement costs incurred by the Government to AOA.

B.     The Government Established A Prima Facie Case That The Reprocurement Contract Was
       For Fundamentally The Same Product Sought To Be Procured Under AOA's Contract

Prior to issuing the RFP, the Navy determined that there were no current sources of

armor that could meet the minimum weight reduction and ballistics requirements that the Navy

wanted, but that the technology had been sufficiently developed so that it was within the then

state-of-the-art to develop an armor that met the Navy's requirements.  See **JE 1 at 0013-0019.**

Dr. Charles Anderson, the Government's expert, testified that "the performance requirements

stated in the contract could be satisfied by state of the art armor," he also said, "by that I mean it

took a ceramic component, a low density ceramic component backed by what we'll call a state of

the art substrate material such as S-2 glass or spectra.  Testimony of Dr. Anderson (Anderson) at

960.

The evidence in the record demonstrates that AOA's and AW' offers were submitted in response to the same RFP, that is, an RFP that sought the procurement of a lightweight armor replacement for the metal armor on the CH-46E helicopter, and that specifically required that the offeror be capable of reducing the weight of the armor by a minimum of 35 per cent, required that the offeror's armor be capable of at least at $V_{50}$ ballistic limit of 2900 fps against a .30 caliber APM2 threat at 30 degree angle of obliquity, and required that the armor have multi-hit capability.

With respect to the weight reduction requirement set forth in the RFP, the Navy did not relax that requirement for either AOA or AW.  As previously explained, AOA's contract contemplated the use of use KSP-60, which would have resulted in a weight reduction of 41 per cent +/- 5 pounds.  JE 47 at 0774.  This weight reduction was an enhancement of the RFP requirement and, as such, was included in AOA's contract.  AOA subsequently switched from KSP-60 to sintered silicon carbide.  JE 136 at 117; Amended Complaint (Am. Compl.) at ¶ 64; Nehmens at 1328.  In issuing the cure notice, and subsequently the termination for default, the Navy, however, only required that AOA meet the minimum weight reduction contained in the RFP of 35 per cent, see JE 7 at 0440 and JE 47 at 0774, thus resulting in a de facto relaxation of the weight reduction specification.

AW's contract contemplated the use of boron carbide, resulting in a weight reduction from 497 pounds, the weight of the existing aircraft armor, to 268 pounds, JE 122 at 1194, equivalent to a weight reduction of 46 per cent.[8]  After AW was forced to switch to hot pressed

---

[8]   The 46 percent figure was calculated by dividing 268 pounds from 497 pounds, and then subtracting that number from 1.

silicon carbide from boron carbide, due to boron carbide's unavailability, its contract was modified to increase the allowable weight by 26 pounds, JE 122, Mod. 3 at 1260, equivalent to a weight reduction of about 39 per cent.[9]  Therefore, while AOA was unable to meet even the minimum 35 per cent weight reduction of the RFP, AW, while not able to meet the contractually required weight reduction of 46 per cent, was able to exceed the minimum weight reduction requirement of the RFP by about four per cent, that is, the weight reduction was 39 per cent and then minimum weight reduction was 35 per cent.  In short, in terms of the weight reduction requirement, the armor procured from AW was substantially the same as the armor sought to be procured from AOA.

With respect to the minimum ballistic requirements set forth in the RFP, the Navy did not relax those specifications for either AOA or AW.  As previously stated, the RFP required that the LWARS meet the $V_{50}$ ballistic limit of 2900 fps against a .30 caliber APM2 threat at 30 degree angle of obliquity as set forth in its contract.  AOA has not, and can not, contend that AW failed to meet the $V_{50}$ ballistic limit of 2900 fps against a .30 caliber APM2 threat at 30 degree angle of obliquity as set forth in its contract.[10]

AOA's only claim in this regard is that in modification 7 the Navy relaxed the contract requirement contained in AW's contract that the tile joint and edges meet the contract's ballistic requirements.  This requirement, however, was not contained in the RFP.  See JE 7.  Because  it

---

[9]    The 39 percent figure was calculated by adding 26 pounds to 268 pounds equaling 294 pounds, then dividing that number  from 497 pounds, and then subtracting that number from 1.

[10]    No testimony was elicited by AOA's counsel that challenged the fact that AW met the minimum ballistic requirements set forth in the RFP.  See Tisone at 380-391; Woehrer at 208-228; Plessinger at 768-778; Winchester at 496-512; and Fitzgerald at 715-733.

was contained in AW's proposal, however, it was included in AW's contract as an enhancement. The requirement that the tile edges and joints meet the ballistic requirements was not part of AOA's contract because it was not contained in the RFP, and was not offered by AOA as an enhancement.  Thus, even if the elimination of this contract requirement was significant, it does not change the fact that the product sought to be procured under AOA's contract with respect to the tile edge and joint issue was exactly the same as the product procured from AW under its contract as changed by modification 7.

To the extent that AOA claims that the extension of AW's NRE period should be a factor in this Court's decision as to whether the product procured from AW was fundamentally the same product sought to be procured from AOA, AOA's claim is legally and factually unsupportable.  While it is the Government's position that the extension of AW's NRE period is not relevant to the Court's decision upon whether the product procured from AW was fundamentally the same product sought to be procured from AOA, we will address that issue on its merits.

As previously noted, AOA's contract provided for an NRE period of five months.  See JE 47 and JE 122.  Pursuant to the five-month NRE period contained in the RFP, and in AOA's contract, AOA was required to complete NRE and deliver the two QTAs within five months of contract award, that is, by November 10, 2004.  JE 47 at 0785.  There is no evidence in the record that AOA ever requested an extension of this deadline.  Moreover, According to AOA's contract, performance under the contract **was** to be completed in 21 months.  Id.

AW's contract also provided for a five-month NRE period.  JE 122 at 1206.  AW's NRE period was extended from five months to nine months because the boron carbide AW identified using in its proposal became unavailable because of an increase in its priority rating under the

Defense Priorities and Allocations Systems (DPAS).  JE 122, Mod. 2 at 1245-1253; Tisone at

368.  While the Navy did modify AW's contract to increase the NRE period by four months, this

change was wholly justified due to a condition not within the control of AW, that is, the

unanticipated unavailability of boron carbide.[11]  See JE 122, Mod. 3 at 1254.  Moreover, this

time was made up by exercising a production option 1.5 months earlier than contemplated, and

compressing the delivery schedule for the production shipsets by 14 months.  JE 122 at 1207.

AW's total program time was thus 15 months, compared to AOA's contratual program duration

of 21 months.  See JE 47 at 0786 and JE 122 at 1207.

        Finally, the fact that AW's NRE period was extended is not relevant for another reason.

According to Dr. Charles Anderson, the Government's expert witness, it was impossible for

AOA to meet both the weight reduction and ballistic requirements of the RFP using the armor

material that AOA was testing.  JE 1 at 0026; Anderson at 960-961.  Because AOA's choice of

armor material was fundamentally flawed, in Dr. Anderson's opinion, AOA could not ever have

delivered a QTA that met the RFP's or the contract's weight reduction and ballistic

requirements, let alone by the November 10, 2004 contractual deadline.  Id.  In short, extending

the NRE period for AOA would have made no difference because, according to Dr. Anderson's

un-rebutted testimony, only if AOA had been willing to switch to boron carbide, or a

high-performance silicon carbide, could AOA have fabricated an armor that met the contractual

_____

        [11]   On cross-examination, Ms. Tisone was asked whether she had the same concern
when AW changed from boron carbide to silicon carbide as the Navy had when AOA changed
from KSP-60 to silicon carbide, to which Ms. Tisone responded that there was not the same
concern because AW's change was due to the unavailability of the proposed material resulting
from the President giving boron carbide a DX rating, meaning that its use for personal armor for
the Army had priority over any other use, and not because of unsuccessful testing.  Tisone at
382-383.

ballistic and weight reduction requirements.  Id.  In summary, Dr. Anderson testified that, in his expert opinion, AOA would never have been able to meet  both the minimum weight and ballistic requirements with the type of silicon carbide AOA choose to use for its ceramic component of its armor material.  Id.

All witness consistently testified the LWARS procured from AW was fundamentally the same LWARS that the Navy sought to procure from AOA.[12]  Ms. Woehrer, the CO, testified that in her opinion the armor procured from AW was fundamentally the same product as the one sought to be procured from AOA because it met all the form, fit and function requirements of the originally contemplated armor that the Navy sought to procured from AOA.  **Woehrer at 204.** Ms. Tisone, whose role in connection with both AOA's and AW's contract was that of the SSA and the supervisory contracting officer, testified that in her opinion  the product that was ultimately procured from AW was fundamentally the same product that the Navy sought to procure from AOA because  the requirements did not change and the basis of the evaluation did not change.  Tisone at 367.  Both Mr. Winchester and Mr. Plessinger testified that in their opinions, the product sought to be procured under AOA's contract and the product procured under the AW contract was fundamentally the same because the Navy used the same specifications.  Winchester at 495-496; Plessinger at 765-767.  Paul Fitzgerald also testified that the two products sought to be procured by the government were fundamentally the same products.  Fitzgerald at 715-716.

---

[12]   The two witnesses called to testify upon behalf of AOA, that is, Arthur Schreiber, the then president of AOA, and John Nehmens, AOA's program manager, offered no testimony relevant to the re-procurement issue because they had no first-hand knowledge about AW's contract and were not qualified as experts to offer opinion testimony. See Nehmens at 1008-1060 See also  JE 135 and JE 136

In short, other than the period of performance and the price, AW's re-procurement contract was in all pertinent respects substantially the same as the contract awarded to AOA. See JE 47; JE 122; Woehrer at 200; Winchester at 495-496; Fitzgerald at 714-715; Tisone at 367. The product the Navy sought to procure was a lightweight substitute for the existing metallic armor on the CH-46E Marine helicopter that was at a minimum 35 percent lighter than the metallic armor with the same ballistic capability as the existing metallic armor. AOA was unable to meet these minimum requirements and was therefore terminated for default. AW, on the other hand, was able to provide the Navy with the lightweight armor the Navy sought to procure, which met the minimum weight reduction and ballistic requirements of the RFP.

C.     AOA Failed Sustained Its Burden Of Proof That There Are Material Differences Between The Product Sought to Be Procured Under AOA's Contract And The Product Procured Under The Reprocurement Contract

AOA has not identified any documentary evidence that there are any material differences between the armor procured from AW and the armor the Navy sought to procure from AOA. Moreover, AOA elicited no testimony that would support a finding that there were material differences between the LWARS provided by AW and the LWARS that the Navy sought to procure from AOA. As previously noted, Ms. Tisone, Ms. Woehrer, Mr. Winchester, Mr. Plessinger, and Mr. Fitzgerald all testified that the armor procured from AW was fundamentally the same armor the Navy sought to procure from AOA.

On cross-examination, Ms. Tisone was not asked any questions about her opinion in this regard. Tisone at 380-391.

On cross-examination, Ms. Woehrer was asked whether she was concerned when AW changed from boron carbide to silicon carbide, to which Ms. Woehrer responded that to some extent she was but believed that AW could meet the minimum contract requirements. Woehrer

21

at 209.  Ms. Woehrer was also asked whether the minimum requirements of the AW and AOA
contract were the same, to which Ms. Woehrer responded in the affirmative, and what Ms.
Woehrer meant when she testified on direct that AW met all of the form, fit and function
requirements of the contract, was that AW did essentially all of the same things that the original
contract had contemplated.  Woehrer at 200.

On cross-examination, Mr. Winchester was asked whether the fact that the Navy
removed from the contract the enhancement offered by AW that the tile joints and edges meet
the same ballistic requirements as the armor affected the strength of the armor.  Winchester at
495.  Mr. Winchester also responded that to the extent he understood the question, AW's armor
was not considered a lesser value armor because of that.  Id.  This was the only question asked of
Mr. Winchester on cross-examination that even arguably was relevant to the issue of whether the
procured product was fundamentally the same product sought to be procured.

Mr. Plessinger on cross examination was asked what the difference was between the
AOA contract and AW contract in regards to the armor's ability to withstand a multiple hit
impact.  Plessinger at 769.  Mr. Plessinger responded that he was unaware what the difference
was and no matter what the requirement, the joints of the armor are generally the weakest part.
Plessinger at 770.  This was the only question asked of Mr. Plessinger during his cross-
examination that was even arguably relevant to whether the procured product was the same
product sought to be procured in the RFP.  See Plessinger at 768-778.

Dr, Anderson on cross-examination was asked no questions regarding whether the armor
procured was different from the armor sought to be procured.  Anderson at 962-996.

In summary, the lightweight armor procured from AW was fundamentally the same
armor that was sought to be procured from AOA.  See JE 47; JE 122; Woehrer at 200;

Winchester at 495-496; Fitzgerald at 714-715; Tisone at 367.  Moreover, AOA has not identified

any evidence that there are any material differences between the armor procured from AW and

the armor the Navy sought to procure from AOA.

D.     The Government Sustained Its Burden Of Proof With Respect To The Damages It
       Incurred As A Result Of AOA's Default

All of the evidence in the record supports the Government's contention that the Navy

actually incurred excess costs in re-procuring the armor from AW, and that the Navy acted

reasonably to minimize the excess costs resulting from the default.

On February 25, 2005, the CO issued a final decision demanding payment of $2,053,808,

the difference between the cost of the contract awarded to AW and the cost of the AW contract,

plus $45,630 in administrative costs, for a total of $2,099,438, as compensation for costs

incurred to re-procure the performance of the contract.  JE 1-25 at 0189 - 0190.  On January 15,

2008, the Government filed an amended counterclaim in which the amount sought in the

counterclaim was reduced to $1,521,650, for excess re-procurement costs and $45,630 for excess

administrative costs, to reflect the amount based upon the evidence presented during the trial of

this matter.  See Defendant's Answer to Plaintiff's Amended Complaint and Defendant's

Amended Counterclaim.  At trial, the Government contended that due to AOA's failure to

adequately perform this work, the Government incurred damages of $1,567,280, for which AOA

is liable.  JE 131 at 1408.  There is no evidence in the record that AOA has paid the re-

procurement costs demanded in the CO's final decision.

Following is a chart reflecting the CLIN line items with the amounts that the Navy paid

AW compared to the amounts that the Navy would have paid AOA if AOA had completed the

contract.  CLIN 0003, covering the provision of the data for CLINs 0001 and 0002, had $0

specified for both the AOA and the AW contract, and CLIN 0004 was for a NTE amount of

$50,000, for both the AOA and the AW contract.  Therefore, they have not been included in the

chart because their inclusion would not change the difference in value between AW's and

AOA's contracts.  See JE 47 at 0767; JE 122 at 1187 and JE 122 at 1188.  For the same reason,

CLIN 0010, the option for travel in support of CLIN 0009, which had a NTE amount of $50,000

for both contracts, was not included.  In addition, the amounts for CLIN 0008AA, the option for

Group A trainer kits, and CLIN 0008AB, the option for Group B trainer kits, were not included

because those options were not exercised.  See JE 122, Mod. 4 at 1264.

| CLIN | AW's Unit Amt. (A) | Units Ord. (B) | AW Paid (C)[13] | AOA's Unit Amt. (D) | AOA (E)[14] | Add. Cost to Navy[15] |
|---|---|---|---|---|---|---|
| 1, NRE | $282,500[16] | 1[15] | $282,500 | $0[17] | $0 | $282,500 |
| 2, QTA | $42,500[15] | 2[15] | $85,000 | $34,907[16] | $69,814 | $15,186 |

---

[13]    The figures in this column were calculated by multiplying the amounts in column A, AW' Unit Amount, by the number in column B, Units Ordered from AW.  The results represents the actual amount paid to AW for the goods covered by the CLIN.

[14]    The figures in this column were calculated by multiplying the number in column B, Units Ordered from AW, by the amount in column D, the amount AOA would have been paid if AOA had completed the contract.

[15]    The figure in this column were calculated by subtracting the amount AW was paid (Column C) from the amount of AOA's cost for the same CLIN (Column E).

[16]    JE 122 at 1187

[17]    JE 47 at 0767

| | | | | | | |
|---|---|---|---|---|---|---|
| 5AA, 147 Gr. A Kits | $27,252[18] | 147[19] | $4,006,044 | $21,528[20] | $3,164,616 | $841,428 |
| 5AB, 79 Gr. A Kits | $27,252[21] | 19[22] | $517,788 | $21,528[23] | $409,032 | $108,756 |
| 6AA, 147 Gr. B Kits | $4,810[24] | 147[25] | $707,070 | $3,428[26] | $503,916 | $203,154 |
| 6AB, 79 Gr. B Kits | $4,810[27] | 19[28] | $91,390 | $3,428[25] | $65,132 | $26,258 |
| 7AA, 6 Gr. A Spares | $27,252[29] | 6[28] | $163,512 | $21,528[30] | $129,168 | $34,344 |

---

[18]   JE 122, Mod. 3 at 1256,  Providing for reduction of the  unit price from $30,670 to $27,252.

[19]   JE 122, Mod. 3 at 1256

[20]   JE 47 at 0768

[21]   See Fn. 17

[22]   JE 122, Mod. 4 at 1263 (17 units purchased) and JE 122, Mod. 6 at 1277 (2 units purchased).

[23]   JE 47 at 0768

[24]   JE 122, Mod. 3 at 1257.  Providing for reduction of the  unit price from $5,500 to $4,810.

[25]   JE 122, Mod. 3 at 1257

[26]   JE 47 at 0769

[27]   See Fn. 23

[28]   See Fn. 21

[29]   See Fn. 17

[30]   JE 47 at 0770

| 7AB, 6 Gr. B Spa. | $4,810[31] | 61[30] | $28,860 | $3,428[32] | $20,568 | $8292 |
| 9, Field Sup. Serv. | $106[33] | 160[32] | $16,960 | $184[34] | $29,440 | -$12,480 |
| | | | | | TOTAL | $1,507,438 |

As demonstrated above, the Navy incurred $1,507,438 in excess re-procurement costs.[35]

In addition, FAR 49.402-7(b) provides as follows:

> (b) If the Government has suffered any other ascertainable damages, including administrative costs, as a result of the contractor's default, the contracting officer must, on the basis of legal advice, take appropriate action . . . to assert the Government's demand for the damages.

The Navy incurred $45,630 in administrative costs as the result of the need to award a re-procurement contract. JE 131. Janice Woehrer, the CO, determined through documents the number of days that it took the engineers to review proposals, prepare discussion questions, review discussion responses, prepare reports and briefs, participate in the SSEB, and debrief

---

[31]   See Fn. 23

[32]   JE 47 at 0771

[33]   JE 122 at 1268

[34]   JE 47 at 0772

[35]   The difference between this amount and the $1,521,650 amount contained in JE 131 is due to the fact that Ms. Woehrer, the CO, included the amounts for CLIN 0008AA and CLIN0008AB, which options were not exercised. The amounts contained in AW's contract for these two CLINs, after the price decrease due to AW's change to silicon carbide, were $54,504, and $9,620, respectively, for a total of $64,124. The amounts contained in AOA's contract for these two CLINs were $43,056, and $6,856, respectively, for a total of $49,912. The difference between these two totals is $14,212. The inadvertent inclusion of these two CLINs, therefore, resulted in overstating the re-procurement costs in JE 131 by $14,212.

26

unsuccessful offerors.  Woehrer at 203-204; JE 131.  After the decision to award the contract to

AW, the engineers had to go back through AW's proposal to identify any enhancements that AW

offered over the RFP requirements in order to include the revised SOW in AW's contract.  Id.  It

took the engineers 15 days to complete this process.[36]  Id.  Ms. Woehrer then multiplied the

number of days each engineer worked on the re-procurement effort by the engineers' burdened

hourly rates for fiscal 2004.  Id.  Ms. Woehrer's testimony in this regard was not challenged on

cross-examination by AOA's counsel.  See Woehrer at 208-228.

　　　　In summary, based upon the evidence, the Navy has established that it is entitled to

recover its re-procurement costs in the amount of $1,507,438, and its administrative costs in the

amount of $45,630.

　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　GREGORY G. KATSAS
　　　　　　　　　　　　　　　　　　Acting Assistant Attorney General

　　　　　　　　　　　　　　　　　　JEANNE E. DAVIDSON
　　　　　　　　　　　　　　　　　　Director

　　　　　　　　　　　　　　　　　　s/Bryant G. Snee
　　　　　　　　　　　　　　　　　　BRYANT G. SNEE
　　　　　　　　　　　　　　　　　　Deputy Director

　　　　　　　　　　　　　　　　　　s/ Leslie Cayer Ohta
　　　　　　　　　　　　　　　　　　LESLIE CAYER OHTA
　　　　　　　　　　　　　　　　　　Trial Attorney
　　　　　　　　　　　　　　　　　　Commercial Litigation Branch
　　　　　　　　　　　　　　　　　　Civil Division, Department of Justice
　　　　　　　　　　　　　　　　　　1100 L Street NW
　　　　　　　　　　　　　　　　　　Washington, D.C. 20530
　　　　　　　　　　　　　　　　　　202-307-0252

Dated: September 29, 2008　　　　　　　Attorneys for Defendant

---

[36]  Jack Plessinger, who was on the SSEB for AW's contract, testified that the evaluation was about a two-week process.  Plessinger at 766.  His testimony in this regard was not challenged.